**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

FIDELITY AND DEPOSIT COMPANY )
OF MARYLAND and ZURICH AMERICAN )
INSURANCE COMPANY, )
)
      Plaintiffs, )
)
v. )     Case No. 16-CV-270-GKF-FHM
)
RIESS FAMILY, LLC, ROBERT A. )
RIESS, SR., and REBECCA RIESS, )
)
      Defendants, )
)
v. )
)
GEORGE THOMPSON, TSOR, L.L.C, and )
ALLIANT INSURANCE SERVICES, INC., )
)
      Third-Party Defendants. )

## OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. #70], filed

by plaintiffs Fidelity and Deposit Company of Maryland and Zurich American Insurance Company

(collectively referred to as "Surety"), and the Motion for Summary Judgment Against Plaintiffs

[Doc. #73], filed by defendant Rebecca Riess. For the reasons discussed below, Surety's Motion

for Summary Judgment is granted, and Rebecca Riess's Motion for Summary Judgment against

Surety is denied.

**I.     Background**

     This case arises from a dispute concerning a General Indemnity Agreement. The

Indemnity Agreement was executed in favor of Surety as consideration for the issuance of surety

bonds naming Sheehan Pipe Line Construction Company as principal on certain construction

projects. Unpaid subcontractors and suppliers have made claims on the surety bonds and Surety

has incurred, and will incur, substantial losses. Surety alleges it made demand on the defendants

to honor their obligations as indemnitors under the Indemnity Agreement, but defendants have

failed to pay. The Complaint contains five causes of action: (1) a claim for breach of the Indemnity

Agreement; (2) collateralization; (3) a claim for exoneration from all loss, liability, damage, and

expense threatened or incurred as a result of issuance of the bonds; (4) a claim for breach of

fiduciary duty; and (5) a claim for an accounting of the defendants' financial statements, books,

and records. *See* [Doc. #2].

The same day Surety initiated this case, defendants filed a Petition for Declaratory Relief

and Alternative Relief against Zurich American Insurance Company in state district court. In that

Petition, the defendants seek a declaratory judgment that the Indemnity Agreement excludes the

personal assets of defendant Rebecca Riess that are not construction assets of Sheehan Pipe Line.

In the alternative, the defendants seek a declaratory judgment that the Indemnity Agreement is

unenforceable based on fraud in the inducement. *See* [Doc. #2-1 in case no. 16-CV-350-GKF-

PJC]. Zurich removed the declaratory judgment action. This court consolidated the action with

this case, and converted defendants' requests for declaratory relief to counterclaims. *See* [Doc.

#23]. Additionally, defendants filed a Third-Party Complaint against George Thompson, TSUR,

L.L.C., and Alliant Insurance Services, Inc.[1] The Third-Party Complaint asserts misrepresentation

and negligence claims.[2] *See* [Doc. #38].

---

[1] "TSUR, L.L.C" is incorrectly named in the Third-Party Complaint as "TSOR, L.L.C." *See* [Doc. #48].

[2] On January 17, 2018, this court granted Robert Riess and Riess Family L.L.C's Unopposed Motion to Dismiss with Prejudice the claims against third-party defendants. However, the claims asserted by Rebecca Riess against the third-party defendants remain pending. *See* [Doc. #69].

Surety seeks summary judgment as to its claims under the Indemnity Agreement—and defendants' counterclaims—against defendants the Riess Family, LLC, Robert A. Riess, Sr., and Rebecca Riess. *See* [Doc. #70]. Rebecca Riess, individually, has filed a motion for summary judgment against Surety. *See* [Doc. #73].

## II.     Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III.  Material Facts

The following material facts are uncontested:

Sheehan Pipe Line Construction Company engaged Alliant Insurance Services, Inc. to represent it in procuring certain performance and payment bonds.  [Doc. #70, p. 11 ¶ 25; Doc. #95, pp. 6-15; Doc. #89, p. 14 ¶ 12; Doc. #110, pp. 2-5; Doc. #73-8, p. 18:3-5].  George Thompson, an employee of TSUR, L.L.C., served as a consultant for Alliant.  [Doc. #70, p. 11 ¶ 24; Doc. #70-7, pp. 6:10-15 and 8:2-4; Doc. #89, p. 14 ¶ 11; Doc. #110, pp. 2-5].  Thompson was not an employee of Surety.  [Doc. #70-7, pp. 6:10-15 and 8:2-4].

Surety agreed to issue certain performance and payment bonds naming Sheehan Pipe Line Construction Company as principal on the following construction projects:

| | | |
|---|---|---|
| (a) | Bond No.: | 09120120 |
| | Obligee: | Ohio River Systems, LLC |
| | Project: | Installation of 36" pipeline in Monroe, Belmont and Jefferson Counties, contract no. MCA-696-2014-1120 |
| | | |
| (b) | Bond No.: | 09120121 |
| | Obligee: | Texas Eastern Transmission, LP |
| | Project: | Installation of 30" pipeline in Monroe, Belmont and Jefferson Counties, contract no. 14-2015 |
| | | |
| (c) | Bond No.: | 09120122 |
| | Obligee: | Transcontinental Gas Pipe Line Company, LLC |
| | Project: | Construction of approximately 531 miles of new 42" Leidy Loop, D Dorrance Loop, Luzerne, PA, contract no. 2015-0006 |
| | | |
| (d) | Bond No.: | 09120123 |
| | Obligee: | Transcontinental Gas Pipe Line Company, LLC |
| | Project: | Construction of approximately 11.47 miles of the company's new 42" Leidy Loop "D" Franklin Loop, Luzerne and Monroe Counties, PA, contract no. 2015-0001 |

[Doc. #70, pp. 6-7 ¶ 3; Doc. #73, p. 6 ¶ 2; Doc. #70-1, pp. 2-3 ¶ 5; Doc. #95-15].  In conjunction with the issuance of the requested bonds, Surety required Robert A. Riess, Sr., the then-president and chief executive officer of Sheehan Pipe Line; Rebecca Riess, Robert Riess's wife; and Riess

Family, LLC to execute a General Indemnity Agreement in favor of Surety. [Doc. #73, p. 6 ¶ 4; Doc. #89, p. 6 ¶ 4; Doc. #88-1]. The General Indemnity Agreement includes the following provisions:

**2. INDEMNITY**: Indemnitors shall exonerate, indemnify, and hold Surety harmless from any and all liability and Loss sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with this Agreement, (d) Surety enforcing this Agreement or (e) any act of Surety to protect or procure any of Surety's rights, protect or preserve any of Surety's interests, or to avoid or lessen Surety's liability or alleged liability. The liability of Indemnitors to Surety under this Agreement includes all Claims made on Surety, all payments made, Loss incurred, and all actions taken by Surety under the Good Faith belief that Surety is, would be or was liable for the amounts paid or the actions taken, or that it was necessary or expedient to make such payments or take such actions, whether or not such liability, necessity or expediency existed. Indemnitors shall promptly, upon demand, make payment to Surety as soon as liability or Loss exists, whether or not Surety has made any payment. An itemized statement of Loss, sworn to by any officer of Surety or the voucher or other evidence of any payment shall be *prima facie* evidence of the fact amount and extent of the liability of Indemnitors for such Loss. Indemnitors shall promptly upon demand procure the full and complete discharge of Surety from all Bonds and all liability in connection with such Bonds. If Indemnitors are unable to obtain discharge of any or all such Bonds within the time demanded, Indemnitors shall promptly deposit with Surety an amount of money that Surety determines is sufficient to collateralize or pay any outstanding bonded obligations.

\*\*\*

**4. PLACE IN FUNDS**: Indemnitors agree to promptly deposit with Surety, on demand, an amount of money that Surety determines is sufficient to fund any liability or Loss. Such funds may be used by Surety to pay Loss or may be held by Surety as collateral against potential future Loss. Any remaining funds held by Surety after payment of all sums due to Surety under this Agreement shall be returned upon the complete release and/or discharge of Surety's liability under all Bonds.

\*\*\*

**28. WAIVER OF EXEMPTIONS**: Indemnitors waive all rights to claim any of their property, including their respective homesteads. as exempt from any levy, execution, sale or other legal process by Surety unless such waiver is prohibited by law.

\*\*\*

30.     **DEFINITIONS:**

* * *

**Claim** or **Claims** means any notice, claim, demand, defense, counterclaim, setoff, lawsuit or proceeding or circumstance which may constitute, lead to or result in Loss, liability, or asserted liability in connection with any Bond, any Bonded Contract, or this Agreement.

* * *

**Loss** means all premiums due to Surety and any and all liability, loss, Claims, damages, court costs and expenses, attorneys' fees (including those of Surety), consultant fees, and all other costs and expenses, including but not limited to any additional or extra-contractual damages arising from Surety's Settlement of any Claim. Pre-judgment and post-judgment interest shall accrue from the date of any payment made by Surety with respect to any of the foregoing at the maximum default rate permitted by law.

[Doc. #88-1, pp. 1-2 and 4-5]. The Indemnity Agreement designates Riess Family, LLC, Robert A. Riess, Sr., and Rebecca Riess as "Indemnitors." [*Id.* at p. 1]

On January 30, 2015, while in Belleville, Illinois, Robert and Rebecca Riess signed the Signature Page for Individual (Personal) Indemnitors, and Robert Riess executed the signature page on behalf of Riess Family, LLC. [Doc. #73, p. 8 ¶ 10; Doc. #89, p. 8 ¶ 10; Doc. #95, p. 16 ¶ 7; Doc. #95-3, p. 82:9-15; Doc. #95-16, p. 13:2-15; Doc. #88-1, pp. 15 and 18]. Monica Lucas, a Sheehan Pipe Line employee and the notary who notarized the signatures, was not present at the time the Riesses signed. [Doc. #73, p. 8 ¶ 13; Doc. #89, p. 9 ¶ 13; Doc. #73-1, p. 57:1 to 58:4; Doc. #95, p. 16 ¶ 8]. The signatures were transmitted via email to Leonard Pataki, then general counsel for Sheehan Pipe Line. [Doc. #73, p. 8 ¶ 14; Doc. #89, pp. 9-10 ¶ 14; Doc. #70-13; Doc. #70-17]. At 1:56 p.m. Central Standard Time, the signature pages were transmitted via email from Pataki to Thompson. [Doc. #70-13; Doc. #70-19, pp. 2-20].

That same day, at 2:15 p.m. Central Standard Time, Pataki received an email from Thompson that was intended to confirm an earlier telephone conversation between Thompson and

Pataki.  [Doc. #73, p. 7 ¶ 6; Doc. #89, p. 6 ¶ 6; Doc. #73-5; Doc. #73-4, p. 78:8-19].  The email

stated as follows:

> Thank you Leonard for all your help.
>
> Please send the original to:
> Tom Finn
> Zurich Surety
> 863 Creston Drive
> Maitland, Fl.32751
>
> Zurich has agreed to issue a rider to the GIA excluding the personal assets of
> Tamara and Rebecca that are not construction assets.  For example for Tamara it
> would be the house in Tulsa, the condo in Hawaii but not limited to that.  David
> and Rob are aware of this and what I will need is a list from both for Zurich to
> review.
>
> I don't know about you but I am planning to have a stiff drink this evening!

[Doc. #73, p. 7 ¶ 6; Doc. #89, p. 6 ¶ 6; Doc. #73-5].  Although the email states, "Zurich has agreed

to issue a rider," Thompson should have typed, "Zurich would *consider* issuing a rider."  [Doc.

#73-4, p. 76:19-25 (emphasis added)].   No representative from Surety had communicated to

Thompson that Surety agreed to issue a rider to the Indemnity Agreement excluding Rebecca

Riess's personal assets.  [Doc. #70-7, pp. 55:16-25; 56:1-4; 57:6-13].  In fact, Thompson never

had any conversations with David McVicker, vice present of Zurich's surety group, regarding a

rider, and only McVicker had the authority to make any decisions with respect to the terms of the

Indemnity Agreement.  [Doc. #73, p. 7 ¶ 8; Doc. #89, p. 7 ¶ 8; Doc. #73-4, pp. 77:12 to 78:2; Doc.

#74-4, pp. 56:16 to 57:13].  Further, although Thompson had conversations at various times with

Tom Finn, a Zurich employee, regarding "some of the conditions, as well as some –including the

indemnity," Finn did not have authority to grant the requested rider.  [Doc. #73, p. 7 ¶ 8; Doc. #89,

p, 7 ¶ 8; Doc. #95-4, pp. 77:12 to 78:2; Doc. #74-4, pp. 56:16 to 57:13].  Nor did anyone from

Surety make any representations to or communicate with either Robert Riess or Rebecca Riess

directly regarding either the Indemnity Agreement or requested rider. [Doc. #89, p. 13 ¶ 2; Doc. #110, pp. 2-5; Doc. #93-1 (continuation), p. 14:6 to 15:2].

Unpaid subcontractors and suppliers on the projects have made claims on the bonds issued by Surety. [Doc. #70, p. 7 ¶ 6; Doc. #95, pp. 6-15; Doc. #70-1, p. 3 ¶ 6]. As a result, Surety has suffered losses, costs, and expenses, including, but not limited to, attorneys' fees, in the amount of $12,726,582.16, accounting for all recoveries and offsets. [Doc. #70-1, p. 3 ¶ 6]. Additionally, Surety has incurred, but not yet paid, an additional $267,070.18 in attorneys' fees and expenses. [Doc. #70-1, p. 4, ¶ 7; Doc. #70-6]. Further, Texas Eastern Transmission, LP has asserted claims totaling $19,637,651.00, plus attorneys' fees, expert fees, costs, and expenses on the payment and performance bond, bond no. 09120121, in a lawsuit styled *Texas Eastern Transmission LP v. Fidelity & Deposit Company of Maryland and Zurich American Insurance Company*, cause no. 2017-03969, pending in the 269th Judicial District Court, Harris County, Texas. [Doc. #70, pp. 8-9 ¶¶ 11-12; Doc. #95, pp. 6-15]. Surety made demand upon defendants under the Indemnity Agreement to exonerate, indemnify, and hold Surety harmless, including a demand to post $19 million dollars to collateralize Surety's anticipated losses. [Doc. #70, p. 9 ¶ 15; Doc. #73, p. 9 ¶ 21; Doc. #89, p. 12 ¶ 21; Doc. #70-5]. Defendants have neither indemnified nor collateralized Surety. [Doc. #70, p. 9 ¶ 16; Doc. #95, pp. 10-11 ¶ 10].

## IV.  Analysis

Surety argues it is entitled to summary judgment on its claims under the Indemnity Agreement—specifically its claims for breach of the Indemnity Agreement and collateralization.[3]

---

[3] Although Surety asserts that it is entitled to summary judgment on all its claims under the Indemnity Agreement, Surety's motion for summary judgment includes no evidence or argument regarding Surety's breach of fiduciary duty claim. Nor does the motion request that the court

Additionally, Surety seeks judgment in its favor on defendants' counterclaims. Rebecca Riess also seeks summary judgment as to the counterclaims.

### A.    Breach of Indemnity Agreement

Oklahoma law requires application of the general rules of contract interpretation to indemnity agreements. *Wallace v. Sherwood Constr. Co.,* 877 P.2d 632, 634 (Okla. Civ. App. 1994) (citing *Luke v. Am. Sur. Co. of N.Y.*, 114 P.2d 950 (Okla. 1941)). Thus, Surety's claim for breach of the Indemnity Agreement is a claim for breach of contract. Under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018). Defendants argue that Surety cannot establish formation of a valid contract for two reasons and therefore Surety's motion for summary judgment should be denied. First, defendants argue that the parties failed to reach a "meeting of the minds." Second, defendants allege that executory deficiencies render the Indemnity Agreement invalid.

### 1.    Meeting of the Minds

 "It is elementary that there must be a meeting of the minds of the parties on all material parts of the agreement in order to settle a valid" indemnity contract. *Watkins v. Grady Cty. Soil & Water Conservation Dist.*, 438 P.2d 491, 494 (Okla. 1968). "As with other contracts, the cardinal rule in the interpretation of an indemnity contract is to 'ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.'" *Estate of King v. Wagoner Cty. Bd. of Cty. Comm'rs*, 146 P.3d 833, 838 (Okla. Civ. App. 2006) (quoting *McAtee v.*

---

enforce Surety's right to exoneration or an accounting. *See* [Doc. #70]. Accordingly, this court will treat Surety's motion as a motion for partial summary judgment.

*Wes-Lee Corp.*, 566 P.2d 442, 444 (Okla. 1977)).  "The intention of the parties should be derived from the whole contract, with particular clauses of a contract being subordinate to the general intent; and every part of a contract should be given effect, 'each clause helping to interpret the others.'"  *Id.* (citing 15 OKLA. STAT. §§ 157, 166).  "If the terms of a contract are unambiguous, clear and consistent, they are accepted in their plain and ordinary sense and the contract will be enforced to carry out the intention of the parties as it existed at the time it was negotiated."  *K&K Food Servs., Inc. v. S&H, Inc*., 3 P.3d 705, 708 (Okla. 2000).

Defendants do not argue that the Indemnity Agreement is ambiguous, nor have they submitted any evidence to support such an argument.  Rather, defendants argue that the court must look beyond the plain language of the Indemnity Agreement to ascertain the parties' intent, citing alleged verbal negotiations to exclude Rebecca Riess's personal assets.  In opposition, Surety argues that the Indemnity Agreement's integration provision—"[t]here are no separate agreements or understandings, either written or oral, that in any way lessen or change my/our obligations as set forth in this Agreement"—bars consideration of any purported oral representations.  *See* [Doc. #88-1, p. 18].

"In Oklahoma, parol evidence of oral negotiations either preceding or contemporaneous with the execution of a written instrument is ordinarily not admissible to vary the terms thereof."  *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp*., 24 F.3d 1190, 1194-95 (10th Cir. 1994).  "However, when it is alleged that false and fraudulent representations were made to induce execution of the contract, but for which representations the obligations would not have arisen, parol evidence in support of such allegations is admissible to prove fraud and to vitiate the contract."  *Id.* at 1195; *see also Dorchester Hugoton, Ltd. v. Dorchester Master Ltd. P'ship*, 898 P.2d 1311, 1315 (Okla. Civ. App. 1995) ("Generally, where fraud is alleged, testimony about

circumstances leading up to signing the instrument and extrinsic facts showing the interpretation the parties put upon the writing is admissible."); *Hensley v. State Farm Fire & Cas. Co.,* 398 P.3d 11, 23 (Okla. 2017) ("The parol evidence rule teaches that unless fraud or mistake is involved, pre-contract negotiations and oral discussions are merged into, and superseded by, the terms of an executed writing."). Further, an integration clause may be set aside on the grounds of fraud. *Thrifty Rent-A-Car Sys., Inc. v. Toye*, 25 F.3d 1058, at *7 (10th Cir. 1994) (unpublished table decision) (citing *Blackledge v. Allison*, 431 U.S. 63 (1977)).

a.     Actual Fraud

Oklahoma recognizes both actual fraud and constructive fraud. "Actual fraud is 'a material false representation, made with knowledge of its falsity or recklessly without knowledge as to its truth or falsity, as a positive assertion, with the intention that it be acted upon by another.'" *Howell v. Texaco, Inc*., 112 P.3d 1154, 1161 (Okla. 2004) (quoting *Varn v. Maloney*, 516 P.2d 1328, 1332 (Okla. 1973)). The elements of actual fraud are: (1) "that the defendant made a material representation that was false"; (2) at the time, defendant knew the representation was false; (3) that defendant made the representation with the intention that it should be acted upon by plaintiff; and (4) that plaintiff relied upon the representation to his detriment. *Silk v. Phillips Petroleum Co.,* 760 P.2d 174, 176-77 (Okla. 1988). Although the existence of fraud is generally a question of fact, "[t]here must be evidence of each element of fraud presented before the issue may be properly submitted to the jury." *Id.* at 177. As the Oklahoma Supreme Court has stated:

> The mere fact that fraud is claimed will not justify the submission of that issue unless facts are produced from which an *irresistible deduction of fraud reasonably arises*. Fraud may not be presumed by the jury from circumstances; it must arise as does any other issue of fact from a preponderance of all the evidence. Deceit, fraud, and fraudulent intent arise from acts and conduct inharmonious with good faith and must emanate from clear and convincing proof.

*Id.* (emphasis in original) (quoting *Johnson v. Aldwell,* 71 P.2d 620, 623 (Okla. 1937)).

As previously stated, defendants assert actual fraud based on Thompson's representations, both written and verbal. With regard to written representations, defendants cite only Thompson's 2:15 p.m., January 30, 2015 email. However, it is undisputed that defendants transmitted the executed signature pages to the Indemnity Agreement to Pataki, who, in turn, transmitted the signatures to Thompson, *prior to* Thompson writing the 2:15 p.m. email. Defendants cannot claim reliance on an email that did not yet exist in executing the Indemnity Agreement. Defendants offer no additional evidence of reliance on any other written representations. Thus, no evidence exists of defendants' reliance on *written* representations to their detriment.

As for verbal representations, defendants contend that the 2:15 p.m., January 30, 2015 email confirmed a prior telephone conversation between Thompson and Pataki in which Thompson conveyed that Surety agreed to the rider excluding Rebecca Riess's personal assets. In opposition, Surety argues that it cannot be bound by Thompson's representations because Thompson was not acting as Surety's agent.[4]

Under Oklahoma law, the court must not presume that an agency relationship exists but, rather, "[t]he burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it." *ZHN, LLC v. Randy Miller, LLC*, No. CIV-12-1289-M, 2015 WL 1143249, at *3 (W.D. Okla. Mar. 13, 2015) (quoting *Enter. Mgmt. Consultants, Inc. v. State ex rel. Okla. Tax Comm'n*, 768 P.2d 359, 364 (Okla. 1988)). An agency relationship may

---

[4] For purposes of this motion, the court need only consider whether Thompson's representations fell within the scope of an agency relationship with Surety—whether actual or apparent—such that Surety may be liable for actual or constructive fraud. Thus, the verbal statements do not present a hearsay issue in the context of this motion briefing. *See Cardoni v. Prosperity Bank*, No. 14-CV-319-CVE-PJC, 2014 WL 3369334, at *5 (N.D. Okla. July 9, 2014).

exist based on actual authority or apparent authority. "[A]ctual authority is created by a principal's manifestation of consent *to the agent* that he is authorized to act on the principal's behalf and subject to his *control*." *Thornton v. Ford Motor Co.,* 297 P.3d 413, 419 (Okla. Civ. App. 2012) (emphasis in original). Based on the court's review, no evidence exists that Surety employed Thompson, controlled Thompson, or authorized Thompson to act as Surety's agent. Rather, based on the undisputed facts, Thompson acted as a consultant for Alliant—a broker retained by Sheehan Pipe Line.[5] Thus, defendants present no evidence that Thompson possessed actual authority to act on behalf of Surety.

Defendants primarily argue that Thompson possessed apparent authority on behalf of Surety. "The existence of an actual agency relationship is not a prerequisite to establishing apparent authority." *Thornton*, 297 P.3d at 420. Rather, "[a]pparent authority results from a 'manifestation by the principal *to a third person* that another is his agent.' The principal's 'manifestation may be made directly to a third person or *to the community by signs or by advertising*.'" *Id.* at 421 (emphasis in original) (quoting *Stephens v. Yamaha Motor Co.,* 627 P.2d 439, 441 (Okla. 1981)). "But, apparent authority exists only to the extent that it is *reasonable* for the third person dealing with the agent to believe that the agent is authorized." *Id.* (emphasis in original) (quoting *Stephens,* 627 P.2d at 441).

---

[5] To the extent that Alliant is an appointed broker for Surety, "agency is a broader term than broker." *Knudson v. Weeks*, 394 F. Supp. 963, 975 (W.D. Okla. 1975). Defendants present no evidence that Alliant acted as an agent for Surety with regard to the bonds. Further, "[i]f one party seeks to bind another by any action of the broker after the execution of the contract, it must be shown that the broker had authority to act." 12 C.J.S. *Brokers* § 82 (2018). Defendants present no evidence that Surety authorized Alliant to grant the requested rider. Rather, it is undisputed that Surety employee McVicker was the sole person authorized to grant a rider excluding Rebecca Riess's personal assets.

Defendants rely on Thompson's deposition testimony that he possessed the authority to relay to defendants matters to which Surety had agreed, and McVicker's deposition testimony that Surety expected brokers (and, presumably, consultants) to relay accurate information to third-parties regarding Surety's approval. However, such evidence relates only to Thompson and McVicker's respective understandings of the relationship between Surety and broker. Defendants present no evidence of any manifestations from *Surety to defendants* regarding the existence, if any, and scope of Thompson's alleged authority on behalf of Surety. Rather, the undisputed evidence demonstrates that Surety made no representations to, and did not directly communicate with, defendants regarding the Indemnity Agreement beyond the plain language of the agreement itself. Nor have defendants presented any evidence of a manifestation to others or the community that could have reasonably led defendants to believe that Thompson possessed authority on behalf of Surety.

Further, evidence that Thompson had the authority to communicate Surety's decisions to defendants does not create a genuine dispute of material fact regarding Thompson's authority to represent to defendants that Surety had agreed to issue the rider in this instance because the representation was outside the scope of any apparent authority. "When a principal puts an agent into a position and while acting with apparent authority, the agent commits a fraud on a third person, the principal is subject to liability to the third person for the agent's fraud." *ZHN, LLC*, 2015 WL 1143249, at *3 (quoting *Thornton*, 297 P.3d at 421). However, "[i]f the agent's fraudulent representations are beyond his apparent authority to make on behalf of his principal, the principal cannot be liable." *DeBoer Constr., Inc. v. Reliance Ins. Co.,* 540 F.2d 486, 491 (10th Cir. 1976).

It is undisputed that no representative from Surety ever conveyed to Thompson that Surety agreed to issue a rider to the Indemnity Agreement excluding Rebecca Riess's personal asserts.[6] In fact, only David McVicker had the authority to make any decisions with respect to the terms of the Indemnity Agreement, including a potential rider, and it is undisputed that Thompson never had any conversations with McVicker regarding the requested rider. Thus, assuming Thompson had the authority to communicate Surety's decisions regarding the requested rider to defendants, defendants have presented no evidence from which a jury could infer that Thompson possessed the authority to bind Surety to the requested rider, and Thompson therefore exceeded any apparent authority by emailing Pataki that "Zurich ha[d] agreed to issue a rider to the GIA excluding the personal assets of Tamara and Rebecca that are not construction assets."

"If the facts of the case are such tha[t] reasonable persons could not disagree as to the conclusion, then the question of apparent authority could be determined as a matter of law." *Wesley Messenger Serv., Inc. v. Am. Standard, Inc.*, No. 04-CV-0858-CVE-FHM, 2006 WL 2599314, at *5 (N.D. Okla. Sept. 11, 2006). As the party asserting an agency relationship between Surety and Thompson, defendants bear the burden of proof. *See Enter. Mgmt. Consultants, Inc.*, 768 P.2d at 362 ("The law does not presume an agency status is present. The burden of proving

---

[6] Defendants argue that this fact is disputed based on deposition testimony of Russell Canterbury, executive vice president of Alliant, alleging that Thompson told Canterbury that Surety had agreed to issue the rider excluding Rebecca Riess's personal assets. *See* [Doc. #95, p. 13, ¶ 14]. However, Canterbury testified only that he recalled a conversation with Thompson wherein Thompson advised Canterbury that Surety had agreed *to consider* issuing a rider. [Doc. #95-8, p. 73:12-18]. Further, it is undisputed that Alliant, Canterbury's employer, was retained by Sheehan Pipe Line, and there is no evidence that Canterbury or anyone else at Alliant possessed authority to grant the rider. In addition, although defendants argue that Thompson discussed a rider excluding Rebecca Riess's personal assets with Tom Finn, an employee of Surety, Thompson testified that Finn did not have the authority to grant the rider and that the request never got any further. [Doc. #95-4, p. 77:12 to 78:2]. Defendants present no evidence that Finn purported to authorize the rider.

the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it.").  Defendants present no evidence from which a reasonable juror could conclude that Thompson possessed actual or apparent authority to represent to defendants that Surety had agreed to the requested rider when, in fact, Surety had not approved the rider.  Therefore the court concludes that Thompson was not acting as Surety's agent as a matter of law.  Because defendants rely solely on alleged representations made by Thompson to Pataki (which were then conveyed to defendants), defendants present no evidence that Surety, or anyone possessing apparent authority on behalf of Surety, made a material representation that was false and therefore defendants' claim of actual fraud fails as a matter of law.

b.      Constructive Fraud

For the same reasons, defendants' constructive fraud claim fails.  Constructive fraud "is the concealment of a material fact by one who has a duty to disclose" and "may be based on either an equitable duty or legal duty."  *Howell*, 112 P.3d at 1161; *see also* 15 Okla. Stat. § 59.   "Where a party has a duty to speak, but remains silent, there may be constructive fraud."  *Key Fin., Inc. v. Koon*, 371 P.3d 1133, 1138 (Okla. Civ. App. 2015).  The Oklahoma Supreme Court has stated:

> A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth.  One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.

*Id.* (quoting *Deardorf v. Rosenbusch,* 206 P.2d 996, 998 (Okla. 1949)).  Thus, first and foremost, in this instance, constructive fraud requires that plaintiff owe defendants a duty of disclosure.  *Specialty Beverages, L.L.C. v. Pabst Brewing Co*., 537 F.3d 1165, 1180 (10th Cir. 2008). Further, defendants must prove: "[t]hat the [plaintiff] misstated a fact or failed to disclose a fact to [defendants]; [t]hat the [plaintiff's] misstatement or omission was material; [t]hat [defendants]

relied on [plaintiff's] material misstatement or omission; and [t]hat [defendants] suffered damages as a result." *Id.* at 1180-81 (formatting altered). Like actual fraud, the existence of constructive fraud is generally a question of fact; however, to submit constructive fraud to the jury, there must be evidence of every element. *Id.* at 1181.

Even viewed in the light most favorable to defendants, defendants present no evidence that Surety owed defendants a duty of disclosure. Defendants argue only that "when Thompson relayed that Rebecca [Riess's] personal assets would be excluded, Thompson, and therefore Zurich, took it upon themselves and became bound to 'disclose all known facts' to Rebecca." [Doc. #73, p. 21]. Defendants' premise their argument on the faulty proposition that Thompson acted as Surety's agent—he did not. Moreover, defendants present no evidence that Surety knew of Thompson's representation to defendants regarding the requested rider. Defendants' failure to present evidence that Surety misstated a fact or failed to disclose a fact to defendants is fatal to the constructive fraud claim. Based on the foregoing, defendants cannot avoid application of the parol evidence rule and integration clause on the basis of fraud.

## 2. Executory Deficiencies

Defendants argue that no contract exists because (1) the original, signed versions of the Indemnity Agreement were not delivered to Surety, and (2) defendants' signature pages contain invalid notarizations. However, in light of this court's ruling on Surety's Motion to Strike Previously Unpled Claims and Defenses in Defendant Rebecca Riess's Motion for Summary Judgment Against Plaintiffs, the court need not consider defendants' executory deficiency arguments. *See* [Doc. #127, pp. 6-10].

Although the court need not consider defendants' arguments, the court is also persuaded that they fail as a matter of law. First, with regard to the original signature pages, receipt of the

original signature page does not constitute a condition precedent to execution of the Indemnity Agreement. *See* [Doc. #127, pp. 7-8]. Most importantly, nothing in the Indemnity Agreement indicates that receipt of the original signature page was a condition precedent to enforcement of the Indemnity Agreement. *See M.J. Lee Constr. Co. v. Okla. Transp. Auth.*, 125 P.3d 1205, 1215 (Okla. 2005) (warning against construing contract provisions as conditions precedent "unless compelled by the plain language of the contract"). Rather, under Oklahoma law, "[o]rdinarily nothing after acceptance is required to make a contract effective. The act of acceptance closes the contract. No formalities are required." *E. Cent. Okla. Elec. Coop., Inc. v. Okla. Gas & Elec. Co.,* 505 P.2d 1324, 1329 (Okla. 1973). Defendants do not dispute that they signed the Indemnity Agreement and transmitted the signature pages to Pataki, who then forwarded the executed Indemnity Agreement to Thompson to send to Surety, effectively closing the contract.[7] *See Garrison v. Bechtel Corp.,* 889 P.2d 273, 281 (Okla. 1995) ("To constitute acceptance, there must be an expression of the intent to accept the offer, by word, sign, writing or act, communicated or delivered to the person making the offer or the offeror's agent.").

Second, with regard to the invalid notarization, as discussed in this court's prior order, notarization is not a condition precedent to the Indemnity Agreement. *See* [Doc. #127, p. 8].

---

[7] Apart from issues relating to notarization, defendants now argue that they did not authorize Pataki to release the signature pages to Surety. However, the evidence cited by defendants does not support defendants' position. *See* [Doc. #95, p. 16, ¶ 11 (citing Doc. #95-1, p. 136:24; Doc. #95-7, pp. 55:1-13; 141:22-142:2; 149:4-25)]. Further, Surety presents evidence that Rebecca Riess provided her signature page to Robert Riess after execution, and that Robert Riess forwarded the signature to Pataki with the understanding that Pataki would assemble the signature pages and forward the completely executed Indemnity Agreement to Surety through Thompson. *See* [Doc. #89-14, p. 254:2-22]. Absent evidence, defendants' assertion that Pataki lacked authority is nothing more than a legal conclusion. It is well-established that "argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009).

Further, under Oklahoma law, nothing more than acceptance is required for a valid contract. *See In re Commercial Fin. Servs., Inc*., 294 B.R. 164, 171 (N.D. Okla. Bankr. 2003). Finally, although not directly on point, the court is persuaded by the cases cited by Surety permitting enforcement of altered negotiable instruments by innocent holders in due course. *See Bost v. Block*, 156 P.2d 610 (Okla. 1945); *Rabon v. Putnam*, 164 F.2d 80 (10th Cir. 1947).

3. Terms of Indemnity Agreement

Based on the foregoing, defendants cannot avoid application of the parol evidence rule and plaintiffs present undisputed evidence of the formation of the indemnity contract. Thus, the court will next consider whether defendants breached the Indemnity Agreement.

Pursuant to Oklahoma's well-settled rules of contractual interpretation, this court must give effect to the parties' intention based on the plain and unambiguous meaning of terms included therein. The Indemnity Agreement requires defendants to "exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with th[e] Agreement, [or] (d) Surety enforcing th[e] Agreement . . . ." [Doc. #88-1, p. 1]. "Claim" includes any notice, claim, demand, defense, counterclaim, setoff, lawsuit or proceeding that may lead to Loss or liability in connection with any Bond or the Indemnity Agreement. [Doc. #88-1, p. 5]. "Loss" means, in part, "all liability, loss, Claims, damages, court costs and expenses, attorneys' fees (including those of Surety), consultant fees, and all other costs and expenses . . . ." [*Id.*]

It is undisputed that, as a result of claims made on the bonds, Surety sustained losses, costs, and expenses, including paid attorneys' fees, in the amount of $12,726,582.16.[8] The Indemnity Agreement requires defendants to indemnify Surety for liability and losses arising from the bonds. Defendants have not so indemnified Surety. Thus, defendants have breached the Indemnity Agreement, and Surety is entitled to indemnification in the amount of $12,726,582.16.

Further, Surety contends it has incurred unpaid attorneys' fees and expenses to investigate, defend, and resolve claims under the bonds in the amount of $267,070.18. The Indemnity Agreement's "Loss" definition plainly requires defendants to indemnify Surety for attorneys' fees, including those of Surety. Defendants have not indemnified Surety for the unpaid attorneys' fees and have breached the Indemnity Agreement. Thus, Surety is entitled to indemnification in the amount of $267,070.18 for unpaid attorneys' fees.

### B. Collateralization

Texas Eastern has sought payment on Bond No. 09120121 in connection with their work on the installation of a 30" pipeline from Surety in a Texas state court lawsuit. Texas Eastern's claim clearly constitutes a claim in connection with a bond for which defendants, as Indemnitors, would be unambiguously obligated to indemnify Surety pursuant to the Indemnity Agreement. Based on the Texas Eastern claim, Surety contends it is entitled to be placed in funds in the amount

---

[8] Defendants assert that a genuine dispute exists as to the amount of Surety's losses, costs, and expenses, citing evidence that Surety received a settlement from the dismissed defendants in the amount of $7.3 million. Defendants argue that they are entitled to a set off of $7.3 million from Surety's claimed losses of $12,726,582.16 and demand for collateralization. However, the affidavit of Darrell Leonard evidencing Surety's claimed losses avers that "[a]ll recoveries and offsets have been accounted for in calculating Surety's losses and expenses to date." [Doc. #70-1, p. 3, ¶ 6]. Defendants offer no evidence that Surety did not account for the $7.3 million settlement in calculating its claimed losses. Thus, the court considers Surety's claimed losses and demand for collateralization as undisputed for purposes of this motion. *See* FED. R. CIV. P. 56(e)(2).

of $19,637,651.00 to protect it from potential losses. The Indemnity Agreement requires defendants, as Indemnitors, to "promptly deposit with Surety, on demand, an amount of money that Surety determines is sufficient to fund any liability or Loss." [Doc. #88-1, p. 2, ¶ 4]. Thus, the express language of the Indemnity Agreement requires defendants, as Indemnitors, to indemnify and collateralize Surety. Defendants have not collateralized Surety and therefore are in breach of the Indemnity Agreement.

C.      *Defendants' Counterclaims*

Surety also seeks summary judgment as to defendants' counterclaims. As previously stated, the counterclaims seeks a judgment establishing that the Indemnity Agreement excludes Rebecca Riess's personal assets that are not construction assets of Sheehan Pipe Line or, in the alternative, that the Indemnity Agreement is unenforceable based on fraud in the inducement. In the response to Surety's motion for summary judgment, defendants also request rescission on the basis of unilateral mistake

1.      Exclusion of Rebecca Riess's Personal Assets

Defendants argue that Rebecca Riess's personal assets should be excluded from the scope of the Indemnity Agreement. However, defendants' argument is contrary to the unambiguous terms of the Indemnity Agreement.

As previously stated, the Indemnity Agreement requires defendants to "exonerate, indemnify, and hold Surety harmless from any and all liability and Loss sustained or incurred, arising from or related to" the bonds or Surety enforcing the Indemnity Agreement. The Indemnity Agreement also includes the following provision:

> **28. WAIVER OF EXEMPTIONS**: Indemnitors waive all rights to claim any of their property, including their respective homesteads. as exempt from any levy, execution, sale or other legal process by Surety unless such waiver is prohibited by law.

[Doc. #88-1, p. 4, ¶ 28].  Finally, the Signature Page for Individual (Personal) Indemnitors, signed by Rebecca Riess, states: "There are no separate agreements or understandings, either written or oral, that in any way lessen or change my/our obligations as set forth in this Agreement."  [Doc. #88-1, p. 18].

Defendants do not argue that the Indemnity Agreement is ambiguous.  Nor can defendants avoid the effect of the parol evidence rule and integration clause, as defendants have presented no evidence of fraud, constructive fraud, misrepresentation by Surety, or a unilateral mistake known by Surety.  *Compare Ware v. City of Tulsa*, 312 P.2d 946, 950 (Okla. 1957) ("[W]here parties enter into a solemn agreement and reduce that agreement to writing, this agreement in the absence of fraud, overreaching, or mutual mistake, must be upheld . . . .") (quoting *Eagle Creek Oil Co. v. Illinois-Oklahoma Petroleum Corp.,* 284 P. 43 (Okla. 1930)).  Thus, under Oklahoma law, this court must interpret the Indemnity Agreement in its plain and ordinary sense.  *See K&K Food Servs., Inc*., 3 P.3d at 708.  The Indemnity Agreement plainly requires defendants to indemnify Surety for liability arising from the bonds.  The Indemnity Agreement includes no provision excluding Rebecca Riess's personal assets.  In fact, pursuant to the terms of the Indemnity Agreement, Rebecca Riess expressly waived her right to seek exemption of her personal assets.  Thus, pursuant to the unambiguous terms of the Indemnity Agreement, Rebecca Riess's personal assets are not excluded.

In her motion for summary judgment against Surety, Rebecca Riess argues that the Indemnity Agreement should be reformed to include a rider excluding her personal assets.

"Reformation is a remedy to make a written contract conform to the antecedent expressions on which the parties based their agreement, and insofar as the written document differs from these antecedent agreements, it will be reformed."  *Thompson v. Estate of Coffield,* 894 P.2d 1065, 1067

(Okla. 1995); *see also* 15 Okla. Stat. § 156. To obtain reformation, defendants must show "(1) instrument representing an antecedent agreement which should be reformed, (2) mutual mistake or mistake by one party and inequitable conduct on the part of the other, which results in an instrument that does not reflect what either party intended, and (3) proof of these elements by clear and convincing evidence." *Id.* at 1067-68 (internal footnote omitted). A unilateral mistake is insufficient. *McKissick v. Yuen*, No. 04-CV-262-JHP, 2008 WL 4372808, at *12 (N.D. Okla. Sept. 18, 2008); *Scott v. Peters*, 388 P.3d 699, 703 n.10 (Okla. 2016).

Here, there is no mutual mistake as defendants have presented no evidence that Surety or its agents authorized a rider excluding Rebecca Riess's personal assets from the scope of the Indemnity Agreement.[9] Rather, the only alleged mistake is defendants' mistaken belief that Rebecca Riess's personal asserts were excluded. Nor do defendants present evidence of inequitable or fraudulent conduct by Surety. A unilateral mistake by one party, in the absence of evidence of inequitable conduct by the other party, does not justify reformation under Oklahoma law. Further, although defendants seek reformation based on Surety's alleged constructive fraud, as discussed herein, defendants' failure to present evidence that Surety misstated a fact or failed to disclose a fact to defendants is fatal to the constructive fraud claim. Thus, defendants are not entitled to reformation, and Rebecca Riess's personal assets are not excluded as a matter of law from the Indemnity Agreement.

### 2. Void or Voidable Contract

Alternatively, defendants seek a judgment that the Indemnity Agreement is void as unenforceable against defendants based on fraud in the inducement. Defendants also request that

---

[9] As previously stated, defendants argue only that Thompson made representations as to the inclusion of the rider. For the reasons discussed herein, Thompson was not Surety's agent.

the court rescind the Indemnity Agreement based on Rebecca Riess's mistake of fact. The court will first consider whether the Indemnity Agreement is void based on fraud in the inducement.

The Oklahoma Supreme Court defines fraud in the inducement as "misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." *Harkrider v. Posey,* 24 P.3d 821, 827 (Okla. 2000) (quoting BLACK'S LAW DICTIONARY 661 (6th ed. 1990)). The effect of fraud in the inducement is to render a contract voidable. *Id.* at 827 n.22. "A contract voidable for fraud in the inducement creates a valid contractual relationship, which subsists in contemplation of law until the parties are relieved of their obligation by a decree of rescission." *Id.* at 827. However, as previously discussed, defendants present no evidence of fraud on the part of Surety.

As for mistake, "[m]istake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: . . .

\*\*\*

2.      [b]elief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."

15 OKLA. STAT. § 63. Contracts which result from a mistake of fact may be subject to rescission or cancellation. *Scrivner v. Sonat Expl. Co.,* 242 F.3d 1288, 1293 (10th Cir. 2001). A mistake of fact may be unilateral or mutual. Here, there is no mutual mistake. Defendants present no evidence that Surety agreed to exclude Rebecca Riess's personal assets and the Indemnity Agreement, as written and signed by defendants, does not exclude those personal assets. Rebecca Riess's belief that her assets were excluded constitutes a unilateral mistake. *See Allison v. City of El Reno*, 894 P.2d 1133, 1136 (Okla. Civ. App. 1994) ("A mutual mistake of fact . . . requires both parties to

labor under the same misconception as to the past or present existence of a fact material to the offer.").

A unilateral mistake justifies rescission only if "the other party was aware of the mistaken party's error." *Id.*; *see also First Fed. Sav. & Loan Ass'n v. Hutchinson*, 591 P.2d 1189, 1191 (Okla. Civ. App. 1978) ("[T]he modern tendency is to recognize unilateral mistake as a ground for rescission of an unexecuted contract . . . the principle is applied when the mistake was known to the other party to the transaction.") (quoting *United States v. Jones*, 176 F.2d 278, 285 (9th Cir. 1949)); 15 Okla. Stat. § 233. As previously stated, defendants have provided no evidence that Surety was aware of, or should have been aware of, defendants' alleged belief that Rebecca Riess's personal assets were excluded at the time that defendants signed the Indemnity Agreement. Further, in light of the evidence the defendants had no direct conversations with Surety regarding the requested rider, a reasonable juror could not conclude that Surety should have been aware of defendants' belief that Rebecca Riess's personal assets were excluded.

Additionally, mistake of fact warrants rescission or cancellation only if the "mistake [is] not caused by the neglect of a legal duty on the part of the person making the mistake . . . ." 15 OKLA. STAT. § 63. Under Oklahoma law, a signatory to a contract cannot escape liability thereunder on the grounds that it failed to read or inquire into the contract's terms. *See Fleming Bldg. Co. v. M2 En'g AB*, No. 09-CV-790-GKF-PJC, 2010 WL 4362830, at *5 (N.D. Okla. Oct. 27, 2010); *Kinkead v. W. Atlas Int'l, Inc.*, 894 P.2d 1123, 1127 (Okla. Civ. App. 1995) ("It is axiomatic that a party cannot avoid a contract on the grounds he or she did not read it, in the absence of fraud, misrepresentation or deceit."); *White v. Kincaid*, 230 P. 908, 909 (Okla. 1924) ("One is not relieved from the obligations of a written contract by reason of having signed it in ignorance of its contents, unless his signature was procured by fraud or mistake."). It is undisputed

that Rebecca Riess did not read the Indemnity Agreement prior to signing it. Further, defendants present no evidence of fraud, misrepresentation, or deceit by Surety. Thus, Rebecca Riess cannot escape liability under the Indemnity Agreement based on ignorance of the contract's terms.[10]

Based on the foregoing, defendants present no competent evidence that the Indemnity Agreement is void for fraud in the inducement. Nor do defendants submit evidence to justify rescission or cancellation of the Indemnity Agreement on the basis of unilateral mistake.[11]

## V.    Conclusion

WHEREFORE,

1. Plaintiffs Fidelity and Deposit Company of Maryland's and Zurich American Insurance Company's Motion for Summary Judgment [Doc. #70] is granted, and

2. Defendant Rebecca Riess's Motion for Summary Judgment [Doc. #73] is denied.

DATED this 4th day of May, 2018.

GREGORY K. FRIZZELL, CHIEF JUDGE

---

[10] To the extent that defendants object based on Surety's failure to personally provide Rebecca Riess a copy of the complete Indemnity Agreement, the evidence demonstrates that Rebecca Riess never asked to see the Indemnity Agreement prior to signing the contract. *See* [Doc. #95-1, p. 56:18-25]. Rebecca Riess at least had the duty to inquire as to what she was signing. *See Calvert v. Swinford*, 382 P.3d 1028, 1035 n.38 (Okla. 2016) ("The duty to read and know the terms of a document before signing it has long been recognized.") (citing *Globe & Rutgers Fire Ins. Co. v. Roysden*, 258 P.2d 644 (Okla. 1953)); *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 835 (10th Cir. 1986) (recognizing legal duty to read document, and that failure to read agreement cannot establish basis for mistake of fact). Defendants present no evidence that Robert Riess did not review the Indemnity Agreement prior to signing.

[11] Surety also argues that Rebecca Riess is estopped from claiming the Indemnity Agreement is invalid and unenforceable. However, because the court concludes that the Indemnity Agreement is valid and enforceable, the court need not address Surety's estoppel argument.